UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 26-2380

In RE: Mylan, Inc., et al,
Petitioners

(E.D. Pa. No. 2:16-md-02724; 2:18-cv-03299; 2:19-cv-4862; 2:20-cv-00695; 2:20-cv-06303)

Present: SHWARTZ, BOVE and SMITH, *Circuit Judges*

1.  Petition for Writ of Mandamus;

2.  Sealed Petition for Writ of Mandamus and Appendix Vol. 2;

3.  Motion by Petitioners for Leave to File Petition for Writ of Mandamus and Appendix Vol 2. Under Seal;

4.  Response to Petition for Writ of Mandamus

5.  Motion for Leave to File a Reply

6.  Reply in Support of Petition for a Writ of Mandamus

Respectfully,
Clerk/sb

_____ORDER_____

The foregoing Petition for Writ of Mandamus is DENIED[1]. As to the Motion to Seal, it is GRANTED. Nothing herein constitutes a ruling concerning future requests to seal the items for which sealing was sought. The Motion for Leave to File a Reply is GRANTED.

---

[1] Judge Bove would have granted the petition for writ of mandamus and denied the motion to seal. He files the attached dissent.

By the Court,

<u>s/D. Brooks Smith</u>
Circuit Judge

Dated: July 29, 2026

**A True Copy**:

Patricia S. Dodszuweit, Clerk

*In re: Mylan, Inc, et al.*, No. 26-2380
BOVE, *Circuit Judge*, dissenting.

The Attorney who survived Defendants' disqualification motion is representing private parties in the very same litigation he led on behalf of Connecticut for more than a decade. This direct monetization of prior government service is beyond the pale. It is also a violation of Rule 1.11(c) of Pennsylvania's Rules of Professional Conduct. The Rule violation undermines the integrity of the proceedings, including an upcoming complex bellwether trial that will have a ripple effect in other multi-district litigation. Ripple effects in the MDL multiply the taint risk that the District Court has authorized.

So I would grant mandamus relief. The decisions of the Attorney, the Firm, and Plaintiffs require disqualification. I would also deny Defendants' motion to seal in order to respect the public's right of access. Therefore, I dissent.

## I.

From a commercial standpoint, there is no mystery about the Firm's hiring of the Attorney and Plaintiffs' desire to pay for the Attorney's services. Plaintiffs are seeking billions in damages relating to pharmaceutical price fixing. Beginning around 2016, the Attorney led an investigation on behalf of Connecticut's Attorney General that overlapped with Plaintiffs' claims almost 100%. During the Attorney's public service, he joined forces with 53 other States and Territories. He gleaned strategic and investigative information during that process. While working for Connecticut, the Attorney spoke privately and confidentially with those regulators, targets of the investigation (including certain Defendants) and their counsel, and witnesses and their counsel. The Attorney's

1

government work also involved coordination with the DOJ and FTC, which conducted parallel federal investigations. There have already been federal deferred prosecution agreements and coordinated state-level civil settlements.[1] Those dispositions all but confirm that sensitive information circulated between the government actors—including the Attorney—for quite some time.

Plaintiffs piggybacked on these government efforts with their own claims against Defendants. The relevant MDL commenced in 2016. The Firm represented Plaintiffs since at least 2019 without the Attorney in their camp. On behalf of Connecticut, however, the Attorney worked closely with Plaintiffs' team.

On July 1, 2025, the Attorney withdrew his appearance for Connecticut. He left government service on July 3. He joined the Firm's partnership on July 7. The Firm touted the Attorney's work on the price-fixing investigation. A press release announced that the Attorney would "continue" to work on the case for his "new private clients." A86. The Attorney entered an appearance on behalf of Plaintiffs on July 9. Not surprisingly, Defendants moved to disqualify the Attorney and the Firm. The District Court denied the motion and refused to certify an interlocutory appeal.

---

[1] *See, e.g.*, Press Release, DOJ, Drug Maker Teva Pharmaceuticals Agrees to Pay $450M in False Claims Act Settlement to Resolve Kickback Allegations Relating to Copayments and Price Fixing (Oct. 10, 2024) [https://perma.cc/PHD6-LKJM]; Press Release, Office of the Attorney General of Connecticut, Attorney General Tong Announces Significant Updates in Multistate Litigation Against Generic Drug Manufacturers Over Conspiracies to Inflate Prices and Limit Competition (Oct. 31, 2024) [https://perma.cc/7A36-TTVP].

## A.

The mandamus-worthy legal misstep here was the District Court's holding that there was "no violation" of Rule 1.11(c). A6, A36. That was "a clear legal error calling for relief that can be obtained through no other means." *United States v. Menendez*, 831 F.3d 155, 164 (3d Cir. 2016); *see also United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980) (applying "plenary review" to interpretation of ethical rules).[2] Rule 1.11(c) prohibits the Attorney from representing Plaintiffs because he obtained "confidential government information" relating to Defendants while he worked for Connecticut. Pa. R. Pro. Conduct 1.11(c). The Attorney "may not" represent Plaintiffs because his confidential government information "could be used" against Defendants. *Id.* It is that simple.

The imputation of the Attorney's Rule 1.11(c) conflict to the Firm is mandatory. Despite the fact that the Firm's representation of Plaintiffs long predated the Firm's hiring of the Attorney, the Firm apparently made no effort to screen the Attorney while the disqualification issue was addressed. And there is no reason to doubt that the decision to proceed in this fashion was the result of an eyes-wide-open decision by sophisticated actors.

Defendants should not have to wait until a direct appeal to correct these errors because "an appeal that comes too late can almost never unscramble the egg." *In re Citizens Bank, N.A.*, 15 F.4th 607, 622 (3d Cir. 2021); *see also In re Asbestos Sch. Litig.*,

---

[2] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, alterations, and subsequent history.

46 F.3d 1284, 1295 (3d Cir. 1994) ("[T]he mere possibility of other methods of review does not absolutely bar consideration of the petition."). Plaintiffs, the Firm's personnel, and other MDL participants cannot unlearn confidential government information passed to them by the Attorney. *See United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 237-38 (2d Cir. 2016) (discussing dangers inherent in the "[a]dverse use of confidential information" and noting "a remedy after final judgment cannot unsay the confidential information that has been revealed"); *In re Dresser Indus., Inc.*, 972 F.2d 540, 543-45 (5th Cir. 1992); *In re American Airlines, Inc.*, 972 F.2d 605, 619 (5th Cir. 1992).

The Attorney and the Firm seek to defend their conduct by pointing to extensive sharing of documentary evidence with Plaintiffs by Connecticut and other States. There is no textual basis for the argument that this sharing cured the violation of Rule 1.11(c). The District Court seems to have been persuaded by the Attorney's "promise" that, "if he has such [confidential] information, he will not share it with his clients or other MDL parties aligned with them." A4. Like the document sharing, the Attorney's CYA promise has no relevance to the application of the Rule.

There was also no basis for the District Court's suggestion that Defendants were required to identify potential "prejudice" under Rule 1.11(c). A5. Because the appearances problem is so significant in this setting, the Rule does not require such a showing. *See City of Philadelphia v. Dist. Council 33*, 469 A.2d 1051, 1054 (Pa. 1983) ("[T]his Court has never required a showing of potential or actual damage for disqualification."). Accordingly, the District Court committed a clear legal error in the application of Rule 1.11(c), which cannot be fully redressed later in a direct appeal.

4

**B.**

I am mindful that this type of ethical violation does not always mandate disqualification. *See In re Boy Scouts of Am.*, 35 F.4th 149, 160 (3d Cir. 2022). There should not be too many cases, however, where a lawyer is permitted to proceed with a representation while violating applicable ethical rules in a way that creates appearances of impropriety. *See IBM v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978) ("[T]he courts have gone so far as to suggest that doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification."); *see also Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) ("[I]n the disqualification situation, any doubt is to be resolved in favor of disqualification."). The five factors set forth in *Boy Scouts* and other cases make clear that this is not such a case. *See* 35 F.4th at 160.

*First*, to the extent the disqualification motion raised any choice-of-counsel issues, Plaintiffs and the Firm created them. Before the Attorney joined the firm in July 2025, Plaintiffs had benefited from the Firm's representation for at least six years. During that period, other lawyers capably represented Plaintiffs' interests. When the Attorney recently joined Plaintiffs' team, they named him as their lead counsel instead of waiting to address the obvious ethical issues. In this context, Plaintiffs' interest in the Attorney's services does not outweigh the attendant ethical violations.

*Second*, it would not be an "undue" or excessive restriction on the Attorney's private-practice prospects to insist that he not draw fees in the same litigation that Connecticut taxpayers previously paid him to steward on their behalf. *In re Boy Scouts*, 35 F.4th at 160. Based on the Attorney's expertise and experience, he has plenty of viable

options for new clients and different matters. Prohibiting the type of ethical violation that the District Court has blessed would not deter reasonable attorneys from entering public service.

*Third*, Plaintiffs and the Firm deployed the only questionable "litigation strategy" at issue. *In re Boy Scouts*, 35 F.4th at 160. The Special Master whose report the District Court adopted was wrong to suggest otherwise. Disqualification may have been "disruptive," and it could "adversely affect" the schedule of the bellwether trial, as the Special Master put it. A26. But that is a problem of Plaintiffs' creation. Defendants should not have to sit on their rights to keep a trial schedule on track in response to this brazen move by Plaintiffs, the Firm, and the Attorney. It will be equally disruptive, if not more so, for judges to address all the issues that will arise at the trial and in the other cases as a result of the Attorney's changed roles. Thus, Defendants' handling of this litigation was not strategic in a problematic sense.

*Fourth*, the negative appearances arising from this situation obviously favor Defendants. The naked and problematic profit-seeking that is manifest in the record is being swept under the rug. At least for now, unless and until there is a direct appeal. In the meantime, no one could fault an observer for wondering if the Attorney was more inclined to exercise his judgment in a manner that pleased Plaintiffs when he started to job hunt while still working for Connecticut. Worse still, in my view, the Firm's press release essentially confirmed that the Attorney's move was timed so that he could use his "deep knowledge" of the case to "serve his new private clients as their cases head to trial." A86. In other words, the Firm hired the Attorney to work for Plaintiffs at the most financially

significant moment of the case.  The existence of these harsh but unavoidable inferences should have been enough to forbid the Attorney's current role.

*Fifth*, the risk of unfair prejudice to Defendants in this case and related ones is substantial.  The suggestion that Plaintiffs' interests are completely aligned with Connecticut's because of previous discovery sharing is misleading at best.  The Attorney was careful to avoid suggesting that he had previously shared *everything*.  In response to the disqualification motion, he contended that he had shared information "extensively" but not completely.  A222.  He emphasized documentary disclosures, but he used amorphous limiters like "important and material information"—as opposed to *all information*—to describe what he disclosed.  A222.  As one indicator among many of the types of information not shared, the Attorney felt it necessary to assure the District Court that he had not "discussed" with new colleagues at the Firm "any information I may have learned during settlement negotiations that I participated in" on behalf of Connecticut.  A227.

Only by suspending common sense can one ignore the extensive non-documentary mental impressions and information that the Attorney obtained during his public service, which are now available to Plaintiffs and the Firm as they prepare for trial.  The Attorney's "deep knowledge" of the case, which is the phrase the Firm used in the press release, includes confidential governmental information that no one should be in a position to sell.  A86.

*     *     *

While the balancing required in any disqualification analysis is typically well insulated by the standard of review in mandamus proceedings, the District Court's

disqualification decision was marred by a clear and unmistakable error in the application of Rule 1.11(c). Profit seeking by the Attorney, the Firm, and Plaintiffs risk diluting the public benefit of investigations and litigation that the Attorney led during his old job. The taint risk arising from the violation is substantial, which risks wasting the extensive judicial resources necessary to adjudicate these matters. Mandamus is the "only avenue with the remedial force to address the District Court's error." *In re Citizens Bank*, 15 F.4th at 621. Therefore, I would grant the Petition and require disqualification of the Attorney and the Firm.

## II.

I also dissent from the decision to grant Defendants' motion to seal the 61 pages of documents in Volume II of their Appendix. The District Court did not act on Defendants' sealing motion relating to these same materials. I understand the hesitation.

The documents are judicial records subject to the common law right of access. *In re ESML Holdings Inc*, 135 F.4th 80, 93 (3d Cir. 2025). The separate access rights under the First Amendment are "even more robust." *Id.* at 94. Defendants have not done enough to justify hiding these materials from public view. For example, one of the documents in Volume II refers extensively to public information and non-sensitive legal authorities. *See, e.g.*, A239-258. There are also materials related to settlements that were publicly promoted by government actors and covered in the press. *See, e.g.*, A263-66, A270-78, A281-289.

If there are reasons that blanket sealing is necessary to keep all of these documents out of the public eye, those reasons are not obvious from Defendants' submission.

Accordingly, I would deny the sealing motion without prejudice and permit Defendants to try again based on the well-established standards that govern their application.